IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 2:08-CR-1153-DCN |
| vs. | ) | |
| | ) | |
| JULIUS NESBITT, | ) | **ORDER & OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on the government's motion to hold defendant in breach of the proffer agreement, and, therefore, to allow the government to introduce statements from defendant's proffers in its case-in-chief. In the alternative, the government requests that it be allowed to offer such statements to rebut any defense that contradicts the proffers. For the reasons set forth below, the court grants the government's motion to introduce statements from defendant's proffers in its case-in-chief.

## I. BACKGROUND

This case arises from defendant's arrest and prosecution for conspiracy to possess with intent to distribute oxycodone, possession with intent to distribute and distribution of oxycodone, possession of firearms in furtherance of a drug trafficking crime, felon in possession of firearms, and willfully causing the Coast Guard to attempt to save a life and property when no help was needed. On July 26, 2007, police from the Georgetown County Sheriff's Office Organized Crime Bureau (OCB) used a confidential informant to purchase two tablets of Oxycontin from defendant at his residence at 9221 Gapway Road, Andrews, South Carolina. The next day, Officer Christopher Geno swore out an affidavit

1

seeking a search warrant for that residence. A state magistrate issued the warrant. On August 2, 2007, the OCB executed the search warrant and found numerous oxycodone tablets, various other prescription pills, several firearms (three shotguns, a rifle, and a pistol), and ammunition.

After his arrest for the gun and drug charges, defendant failed to appear for a state court date in November 2007. Instead of appearing for court, defendant tried to fake his own death and flee. The Coast Guard spent more than $170,000 trying to rescue defendant. Smelling a rat, authorities broadened their search for defendant, who was eventually found by the United States Marshal's Service in Indiana with $30,000 in counterfeit money and a stolen vehicle.

Defendant was federally indicted in Indiana on counterfeiting charges. He pled guilty on August 21, 2008, and received a time-served sentence on February 26, 2009. Defendant was indicted in the instant case in the District of South Carolina on November 12, 2008. Between his indictment in South Carolina and his sentencing in Indiana, defendant's counsel in Indiana and government counsel engaged in prolonged plea negotiations in an effort to resolve defendant's South Carolina charges at the same time as his Indiana charges. Those efforts failed, and, after his sentencing in Indiana, defendant was transferred to this district, making his initial appearance in South Carolina on April 8, 2009.

Defendant made two proffers, one on May 21, 2008 and the other on July 17, 2008. In these two proffers, defendant admitted to much, if not all, of the conduct that forms the basis for his criminal charges in South Carolina. Among other things,

defendant admitted that he staged his own death, distributed oxycodone, and possessed firearms.

Before making the proffers, defendant and the government entered into a proffer agreement on March 14, 2008. The agreement provides that, as long as defendant was truthful in his proffers, the government would not use any of the information against defendant in any civil or criminal proceeding. Specifically, the agreement reads,

> By signing this "Proffer Agreement," Client agrees to be fully truthful and forthright with the United States Attorney's Office for the District of South Carolina and federal law enforcement agents in their investigation of all unlawful activities, to include, but not limited to, truthful and complete debriefings with no misstatements or material omissions of fact of Client's knowledge concerning all unlawful activities. . . . Client's failure to be fully truthful and forthright at any stage will, at the sole election to the Government, cause the obligations of the Government within this Agreement to become null and void. **Further it is expressly agreed that if the obligations of the Government within this Agreement become null and void due to lack of truthfulness on Client's part:**
>
> . . .
>
> **(2) the Government may use for any purpose any and all statements made and other information provided by Client in the prosecution of Client on any charges, including perjury.** Client accepts this provision being fully advised that under Fed.R.Evid. 410, statements made by Client pursuant to this Agreement would not ordinarily be admissible in any criminal proceedings including perjury and making false statements unless the statements were made under oath, on the record, and in the presence of counsel.

The agreement further provides:

> In the event that Client is a witness at trial or other proceeding concerning any matter discussed in this Proffer and testifies materially different from any statements made or other information provided during this Proffer, the Government may cross-examine Client concerning any statements made or other information provided during this Proffer, *or use such to rebut any evidence or arguments offered by or on behalf of Client (including arguments made or issues raised sua sponte by the District Court) at any stage of the*

> *criminal prosecution (including bail, trial, and sentencing) should any prosecution of Client be undertaken.*
>
> *. . .*
>
> *To the extent the Government is entitled under this Agreement to offer in evidence any statements made or other information provided by Client or leads obtained therefrom, Client shall assert no claim under the United States Constitution, any Statute, Rule 410 of the Federal Rules of Evidence, or any other federal rules that such statements made or other information provided or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.*

(Emphasis added). Defendant, his counsel, and the government's counsel signed the agreement. Just above defendant's signature is the phrase, "I AGREE AND ACCEPT THE TERMS OF THIS AGREEMENT."

## **II. DISCUSSION**

The government argues that defendant breached the proffer agreement by not being truthful in at least two respects: 1) not stating that Julie Clarke, defendant's sister, knew of his plan to stage his own death, and 2) not mentioning Robbie Barnes, someone who bought oxycodone from defendant and also sold the drug for defendant. Thus, says the government, defendant was not completely truthful and his proffer statements should be admissible during the government's case-in-chief. Alternatively, the government requests to use the proffers to rebut any defense raised at trial by defendant.[1]

Under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure

---

[1] The government's alternative requested relief is not necessary because the court grants its primary requested relief and because defendant did not trigger the "rebut" provision of the proffer agreement at trial. It is clear, however, that if defendant had triggered this provision, the government would have had a separate basis, aside from defendant's untruthfulness, to offer the proffer statements at trial.

11(e)(6), statements made during plea negotiations are inadmissible at trial. A defendant can, however, waive the right to preclude the use of these statements, provided that the waiver is knowing and voluntary. See United States v. Mezzanatto, 513 U.S. 196 (1995). A waiver is made knowingly if the defendant has a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and it is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). "A defendant's understanding of the consequences of his waiver need not be perfect; it was Krilich's understanding of the rights being relinquished, not of all possible repercussions of relinquishing them, that made his waiver knowing." United States v. Krilich, 159 F.3d 1020, 1026 (7th Cir. 1998) (citing Colorado v. Spring, 479 U.S. 564 (1987)). "The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law." United States v. Pielago, 135 F.3d 703, 709 (11th Cir. 1998). "Any ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant." Id. at 709-10. The Seventh Circuit, in an opinion written by Judge Easterbrook, noted the following rationale for conditional waivers in proffer agreements:

> By authorizing the prosecutor to use his statements if he should contradict himself, Krilich made his representations more credible and thus strengthened his hand in negotiations. See Mezzanatto, 513 U.S. at 207, 115 S.Ct. 797; Eric Rasmusen, *Mezzanatto and the Economics of Self-Incrimination*, 19 Cardozo L. Rev. 1541 (1998). A prosecutor may be reluctant to negotiate; what has the defendant to offer? A statement that shows how the defendant's aid could assist the prosecutor in other cases (or lead to the appropriate sentence in this one) may get negotiations under way and set the stage for a favorable bargain. But a prosecutor needs assurance that the defendant is being candid. A conditional waiver of the kind Krilich

5

> signed tends to keep the defendant honest, which makes the proffer device more useful to both sides. For this strategy to work the conditional waiver must be enforceable; its effect depends on making deceit costly. We therefore reject the argument that waivers should be construed against prosecutors; that might help Krilich today but would hinder bargaining for other defendants tomorrow. We give this waiver neither a stingy reading nor a generous one, but a natural reading, which leaves the parties in control through their choice of language.

Krilich, 159 F.3d at 1024-25.

Failure to be fully truthful in the proffer—when the proffer requirement requires truthfulness—is one way that defendants can breach their proffer agreements. For example, in United States v. Davis, 393 F.3d 540 (5th Cir. 2004), the Fifth Circuit noted in the context of a plea agreement that,

> We note that in United States v. Cantu, 185 F.3d 298 (5th Cir.1999), we recognized that the government's use of self-incriminating information provided by the appellant during debriefing raised Fifth Amendment concerns. Id. at 303. This case is distinguishable from Cantu. In Cantu, the government's proffer agreement specifically provided that "no statements made or other information or documents provided by you during the proffer will be used directly or derivatively against you in any criminal case." Id. at 302. Unlike Cantu, Davis freely and voluntarily agreed in his plea agreement that failure to provide complete and truthful information could render the agreement unenforceable and could result in his prosecution and the use of his statements against him in any proceeding. Thus, he knowingly and voluntarily agreed to the use of his statements and his prosecution in the event of his breach of the agreement. Accordingly, we have no Fifth Amendment concerns here.

Id. at 547 n.1. Similarly, in United States v. Reed, 272 F.3d 950 (7th Cir. 2001), the Seventh Circuit found that the defendant had breached his proffer agreement, which contained a "complete and truthful" information provision, when he lied about the extent of his methamphetamine manufacturing. The court held that "[o]nce the district court determined that the agreement had been violated, then, the government was free to use

Reed's statements against him at trial." Id. at 955.

Not complying with a "truthfulness" provision in a proffer agreement is but one way for a breach to occur. When the agreement contains other provisions that provide for waiver, failure to comply with those provisions can lead to introduction of proffer statements at trial. For example, the Third Circuit held that cross-examination of a government witness could trigger the introduction of proffer statements, if that cross-examination is aimed at creating an inference that differs from the content of the proffer statement. See United States v. Hardwick, 544 F.3d 565, 571 (3d Cir. 2008). In Hardwick, one of the defendants had entered into a proffer agreement before trial. That defendant had admitted to planning and participating in two murders. After the close of the government's case-in-chief, the government moved for the admission of the defendant's proffer statements, arguing that by attempting to elicit contradictory evidence through cross-examination, the defendant, through his attorney, had breached the proffer agreement. The trial court agreed, and the defendant argued against its admission on appeal. Id. at 569. The Third Circuit, citing Mezzanatto, noted that in that case, the Supreme Court only dealt with the enforceability of proffer waivers for impeachment purposes and that some justices had expressed doubt as to whether a waiver could be used to admit statements in the government's case-in-chief. See id. (citing Mezzanatto, 513 U.S. at 210). However, the court also noted that other circuit courts, addressing the validity of proffer waivers which went well beyond impeachment and deciding the issue with the guidance of Mezzanatto, have been unanimous in their treatment of such waivers, in each case upholding their use. See id. at 570 (citing United States v. Velez,

354 F.3d 190, 196 (2d Cir. 2004); Krilich, 159 at 1025-26; United States v. Rebbe, 314 F.3d 401, 407 (9th Cir. 2002); United States v. Burch, 156 F.3d 1315, 1321-22 (D.C. Cir. 1998)). The Third Circuit then upheld the trial court's ruling that cross-examination attempting to contradict the specific facts of the proffer statement triggered the statement's admission. Id. at 570-71.

Though lacking a substantial body of law on the subject, the Fourth Circuit has addressed the issue of admissibility of proffer statements. In United States v. Singletary, the court held that one of the defendants, Sansbury, had "waived any rights he might have had under Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410 when he signed the proffer letter." United States v. Singletary, 948 F.2d 1283 (Table) (4th Cir. November 21, 1991).

> In the proffer letter, which Sansbury signed upon his arrest, he denied any involvement in the drug business but indicated that he knew that Jerry Singletary had a long history of dealing drugs. The terms of the proffer letter stated that any statements made pursuant to the proffer would not be used against him in any civil or criminal proceeding, except as follows:
>
>> In the event that [Sansbury] is a witness at a trial concerning any matter discussed in this proffer and testifies materially different from any statements or other information provided during this proffer or discussion, the Government may cross-examine [Sansbury] concerning any statements made or other information provided during this proffer. . . .
>
> At the trial, Sansbury took the stand and stated that he had no idea that Singletary was a drug dealer until federal agents came to seize one of Sansbury's cars two weeks before his arrest. Because Sansbury's statements were materially different from the statements made in the proffer, it was not error for the district court to allow the government to use the proffer statements to impeach Sansbury on cross examination.

Id. Thus, the Fourth Circuit has approved the use of a proffer statement against a defendant at trial pursuant to the proffer agreement's terms.

8

Moreover, the Fourth Circuit has joined other circuits in holding that proffer agreements, like contracts, are governed by their express terms. In United States v. Lopez, 219 F.3d 343 (4th Cir. 2000), the Fourth Circuit addressed the admissibility of proffer statements at sentencing. There, the court held the district court erred by allowing use of the proffer for sentencing purposes because the proffer's terms did not allow for such use. Id. at 346. However, this holding along with other language in the Lopez opinion indicates that the Fourth Circuit adheres to the view that proffer agreements, like contracts, should be interpreted and implemented according to their terms. See id. (citing United States v. Cobblah, 118 F.3d 549, 551 (7th Cir. 1997) (explaining that a proffer agreement is a contract governed by its express terms); United States v. Shorteeth, 887 F.2d 253, 256-57 (10th Cir. 1989) (same)); see also United States v. Daniels, 2006 WL 1888823, at *1 (4th Cir. July 10, 2006) (holding that proffer agreement was breached where agreement required the defendant to be truthful and the defendant subsequently failed a polygraph exam).

As an initial matter, this court notes that defendant knowingly and voluntarily waived his right to preclude the use of his proffer statements. Defendant signed the agreement, acknowledging that he agreed to its terms. Defendant had a lawyer during this process, and his lawyer also signed the agreement. Indeed, no argument has even been advanced that defendant did not knowingly and voluntarily enter into the proffer agreement. Moreover, the court notes that defendant has not contested, either in his opposition brief or in open court, that he breached the agreement by not revealing that Julie Clarke, defendant's sister, knew of his plan to stage his own death and by not

mentioning Robbie Barnes, someone who bought oxycodone from defendant and also sold the drug for defendant.[2]

Pursuant to the terms of the proffer agreement, defendant's end of the bargain included providing "truthful and complete debriefings with no misstatements or material omissions of fact of Client's knowledge concerning all unlawful activities." Defendant's statement in his proffer that no one knew of his plan to stage his own death and flee except for Max Reed was clearly a material misstatement. At the very least, defendant's sister, Julie Clarke, knew of his plan to flee the jurisdiction. Likewise, defendant's failure to mention Robbie Barnes as both a purchaser and distributor of oxycodone was a material omission. There is no chance that this was an innocent oversight given the testimony at trial describing a close, personal relationship between defendant and Barnes. Both the misstatement and the omission were material because both tended to minimize the true extent of defendant's drug trafficking enterprise and his scheme to flee South Carolina to avoid prosecution. Regarding the Barnes omission in particular, this lie

---

[2] The thrust of defendant's argument in opposition appears to be that the government was dilatory in announcing its intent to hold defendant in breach of the proffer agreement and that allowing use of defendant's statements with such late notice would amount to trial by ambush. This argument ignores the fact that the government first alerted the defense to the proffer agreement issue in its response to defendant's motion to suppress, in which he raised an issue concerning the ownership of his home that was inconsistent with his proffer statement. The issue again arose in the context of defendant's later-withdrawn motion to sever, in which he raised an issue concerning his staged death that was inconsistent with his proffer statement. Finally, the government learned of defendant's lack of truthfulness, at least with regard to the Clarke issue, on the eve of trial through witness interviews. Thus, contrary to defendant's assertion otherwise, defendant's breach of his proffer agreement has been a consistent theme throughout this case, and the government's pretrial motion in limine to allow use of the proffer statements hardly amounts to an ambush.

deprived the government of the very benefit that the agreement was intended to secure—information that would help law enforcement identify and prosecute other oxycodone traffickers. Having agreed to provide fully truthful information and having failed to do so, defendant is in breach of the proffer agreement. Accordingly, the government can avail itself of the remedy the agreement expressly provides.

### III.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the government's motion to hold defendant in breach of the proffer agreement, and, therefore, to allow the government to introduce statements from defendant's proffers in its case-in-chief is **GRANTED**.

    **AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**September 14, 2010**
**Charleston, South Carolina**